**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**RACHEL JONES** and **NANCY JONES**,  )
           Plaintiffs,  )
                               )
        vs.  )      2:03cv1081
                               )      **Electronic Filing**
**INDIANA AREA SCHOOL DISTRICT,**  )
**KATHLEEN R. KELLEY, RODNEY**  )
**RUDDOCK** and **ARIN**  )
**INTERMEDIATE UNIT,**  )
           Defendants.  )

<u>**MEMORANDUM OPINION**</u>

October 25, 2005

## I.    INTRODUCTION

      Defendant ARIN Intermediate Unit and Defendants Indiana Area School District,

Kathleen R. Kelley and Rodney Ruddock have filed motions for summary judgment. After

careful consideration of the motions, the memoranda of law in support and in opposition and the

supporting materials supplied by the parties, this Court will grant ARIN Intermediate Unit's

motion with respect to Plaintiffs' request for punitive damages in Count IV and deny it in all

other respects. The Court will grant the motion filed by defendants Indiana Area School District,

Kathleen R. Kelley and Rodney Ruddock with respect to Counts II, III and V of the complaint

and deny the motion with respect to Counts I and IV.


## II.    STATEMENT OF THE CASE

      Rachel Jones was a student in the Indiana Area School District (School District) at the

time of the events at issue. Nancy Jones, Rachel's mother, is employed as a Vision Specialist by

ARIN Intermediate Unit (ARIN), an agency that provides educational services to the eleven

school districts within its geographical boundaries of Armstrong and Indiana Counties,

Pennsylvania. This case arises out of the alleged harassment of Rachel by another former

student, a special education student referred to by the parties as "John Doe." Plaintiffs contend

that the School District, its Superintendent (Kathleen R. Kelley) and the principal of the high

school (Rodney Ruddock) (together, the School District Defendants) were aware that John Doe

was harassing Rachel but did nothing to prevent or remedy it, thereby violating Rachel's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 (Title IX) and her rights to bodily integrity and equal protection of the laws under the Fourteenth Amendment. Plaintiffs also allege that Defendants retaliated against Nancy for exercising her First Amendment rights when ARIN complied with the School District's request to have her transferred out of the School District. Finally, they allege that Kelley subjected Nancy, and Kelley and Ruddock subjected Rachel, to intentional infliction of emotional distress in violation of Pennsylvania law.

Facts

During the relevant times at issue, Rachel was a student at the School District, Kelley was the Superintendent of the School District, Ruddock was the principal of the high school and Nancy was employed by ARIN as a Vision Specialist. (Compl. ¶¶ 2-3, 6-7; Answers ¶¶ 2-3, 6-7.) John Doe is mentally retarded and has Sturge-Weber Syndrome. (Rebovich Dep. at 13.)[1] He has been identified as a special education student. (Pretrial Stip. § III, ¶ 6.)[2] Rachel and John Doe were assigned alphabetically to the same home room in the seventh, eighth and ninth grade years at the Indiana Junior High. (Pretrial Stip. § III, ¶ 7.)

Rachel has stated that, beginning when she was seventh grade in 1997, John Doe began harassing her, in the form of "unwanted attention and affection." (Rachel Dep. at 35-36; Nancy Dep. at 16.)[3] Rachel told her homeroom teacher in the eighth and ninth grades about Doe's conduct and she gave the teacher a copy of a letter or drawing John Doe gave to her. (Rachel Dep. at 45-47.) The teacher separated their desks. (Nancy Dep. at 27-28.)

---

[1]This excerpt from the deposition of Lois Rebovich is included in the School District Defendants' Appendix (Docket No. 44) ("S.D.D. App.") at page 62.

[2]On December 2, 2004, the parties filed a Pretrial Stipulation (Docket No. 34) in which they agreed that certain facts will require no proof at trial.

[3]S.D.D. App. at pages 5-6, 16. Unless otherwise identified, excerpts from Nancy's deposition are included in Plaintiffs' Appendix (Docket No. 56) as Exhibit A and excerpts from Rachel's deposition are in Exhibit B.

Nancy had multiple conversations with Rachel's guidance counselor, Linda Chrielson, about John Doe's conduct.  Nancy was particularly concerned because Rachel was small and John Doe was large.  Rachel began suffering from anorexia.  (Nancy Dep. at 28-29.)

John Doe had an Individualized Education Program (I.E.P.) with a behavior plan at this time, but there was no mention of his harassing behavior toward Rachel or any other student, and no services were provided to help him deal with it.  (Pls.' App. Ex. R.)

Prior to beginning of Rachel entering tenth grade, Nancy had a conversation with John Doe's new special education teacher, Lois Rebovich.  (Nancy Dep. at 30.)  Mrs. Rebovich stated that she was already aware of the problem and that she had taken John Doe out of Rachel's homeroom and moved his locker.  (Pretrial Stip. § III, ¶ 10; Nancy Dep. at 30.)  Mrs. Rebovich said she would do what she could.  (Nancy Dep. at 33.)  John Doe continued to give Rachel notes and drawings and he told her he wanted her to be his girlfriend every day.  (Rachel Dep. at 45-47.)

He told her he wrote about her in his journals.  Rachel told him that she had a boyfriend and that she would never be his girlfriend.  When she turned down his request to take her to a dance, he hit a wall in front of her.  (Rachel Dep. at 59-60.)  During that same school year, Nancy had continued conversations with Mrs. Rebovich to discuss John Doe's unwanted attention and affection towards Rachel.  (Pretrial Stip. § III, ¶ 11.)

When Rachel was in eleventh grade, John Doe began stalking her.  He would wait for her at her locker and walk to her classes and he wanted to carry her books.  Rachel stated that "He was everywhere."  (Rachel Dep. at 64.)  She went for help to Bill Waryck, her A.P. Biology Teacher and head of the Student Assistance Program.  (Rachel Dep. at 72, 80.)  She told him that John Doe was bothering her, talking to her incessantly and wanted to be her boyfriend.  Waryck stated that he clearly remembered her coming to him on one occasion, although she may have said something about it again.  He told Rachel to bluntly tell John Doe that she did not want to be

his girlfriend and that he should leave her alone. (Waryck Dep. at 12-15, 42.)[4]  Rachel spoke to

Waryck about the situation on numerous occasions and Waryck said he would do what he could.

(Rachel Dep. at 82.)

   Waryck made an effort to stand in his classroom doorway between classes to watch

Rachel at her locker because he knew that John Doe would wait for her there.  Waryck continued

to do this for the two years that Rachel remained in the high school. (Waryck Dep. at 13-14, 16-

17.)[5]  He also advised Mrs. Rebovich and Assistant Principal Holly Rougeaux (then named Holly

Lecce) of the situation.  (Rebovich Dep. at 34-35; Waryck Dep. at 25-27.)[6]  He indicated that he

did not take discipline problems such as this one to the Student Assistance Program team, but

instead told students to take them to the principals.  (Waryck Dep. at 24.)

   During the spring of Rachel's eleventh grade school year, John Doe began waiting for

Rachel after track practice and hanging around her car.  (Rachel Dep. at 70-71.)  Rachel and

Nancy met with Luanne Kokolis, then Vice Principal of the high school.  (Rachel Dep. at 73-74,

79; Kokolis Dep. at 18-19, 52.)[7]  Mrs. Kokolis informed Nancy at their first meeting in April that

she had already been apprised of the situation by Mrs. Rebovich.  (Nancy Dep. at 39.)  Rachel

said that she felt uncomfortable because John Doe was around her too much and she wanted him

to stop sitting by her in the cafeteria, standing at her locker and giving her gifts and notes.

(Kokolis Dep. at 18-19, 52; Rachel Dep. at 73-79.)  Mrs. Kokolis told Rachel she could not do

anything about John Doe hanging around her car because the car was not on school property.

(Rachel Dep. at 73.)  Rachel also indicated that John Doe was getting very angry and she heard

---

   [4]S.D.D. App. at pages 113-16, 122.  Unless otherwise identified, excerpts from William
Waryck's deposition are included in Plaintiffs' Appendix as Exhibit D.

   [5]S.D.D. App. at 114-15, 117-18.

   [6]S.D.D. App. at pages 63-64 and 119-20 (except for page 25 of Waryck's deposition).
Unless otherwise identified, excerpts from Lois Rebovich's deposition are included in Plaintiff's
Appendix as Exhibit F.

   [7]S.D.D. App. at pages 52-53, 59.  Unless otherwise identified, excerpts from Luanne
Kokolis' deposition are included in Plaintiffs' Appendix as Exhibit E.

that he and his friends were looking for her to beat her up after school.  (Rachel Dep. at 84.)

Mrs. Kokolis said she spoke with John Doe and Mrs. Rebovich about the situation and explained to him that he could not be friends with Rachel anymore and was not permitted to be around her.  Apparently, this made John Doe angry.  (Kokolis Dep. at 19, 27-29.)[8]  Mrs. Kokolis also believed that John Doe's behavior toward Rachel ended after she spoke to him.  (Kokolis Dep. at 40.)[9]  However, Plaintiffs noted that Mrs. Kokolis was later informed of subsequent developments and had a meeting with John Doe's parents in the spring of Rachel's junior year.  (Nancy Dep. at 40.)

On March 22, 2001, an I.E.P. conference was held, attended by John Doe, his mother, Mrs. Rebovich and Principal Ruddock, among others.  The team removed John Doe's behavior plan, recommended no discipline, no behavior plan and no services.  In response to the question on the form that asked "Does the Student Exhibit Behaviors that impede his/her learning or that of others?" the I.E.P. team checked "no."  (Pls.' App. Ex. R, Mar. 22, 2001 I.E.P. at 2.)

In Rachel's senior year, on September 11, 2001, John Doe attempted to get into her car as she was leaving school.  He held onto the door handle and banged on the glass as she tried to get away.  She was hysterical when she arrived at home.  (Rachel Aff. ¶ 2; Rachel Dep. at 84-85.)[10]  Vice Principal Rougeaux stated that, if the incident occurred off of school grounds, there was little the administration could do about it.  (Rougeaux Dep. at 31.)[11]  Rachel, however, testified that she was a senior with an assigned parking space in the school parking lot and the incident occurred in the school parking lot.  (Rachel Aff. ¶ 3.)  She further stated that Rougeaux knew about the incident, that both she (Rachel) and her mother told Rougeaux that it had occurred on

---

[8]S.D.D. App. at 53, 54-56

[9]S.D.D. App. at 57.

[10]The affidavit of Rachel Jones is attached to Plaintiffs' Appendix as Exhibit X.

[11]S.D.D. App. at 74.  The School District's Concise Statement of Material Facts asserts that the incident occurred off school grounds.  (Docket No. 41 ¶ 20.)  However, Rougeaux's testimony is that she assumed it occurred off school grounds and that she did not actually know where it happened.

school property, and that the School District did nothing about it except to reassure them that John Doe would be reminded and it would not happen again. (Rachel Aff. ¶¶ 4-5.) Nancy was also told that they were reminding John Doe and it would not happen again. (Nancy Dep. at 49.) After this incident, however, John Doe continued to appear at Rachel's locker, at track practice and in the school parking lot. (Rachel Dep. at 90.)

On December 13, 2001, John Doe found Rachel in the high school weight room and physically blocked her from leaving for half an hour, until another student came to her rescue. (Pls.' App. Ex. J.) Both Rachel and Nancy reported this incident to the School District administration. Nancy received no response from Waryck or Rebovich. (Nancy Dep. at 51-52; Rougeaux Dep. at 124.)[12] The School District contends that it immediately initiated an investigation. (Ruddock Dep. at 61, 66; Rougeaux Dep. at 84.)[13]

On December 17, 2001, School District administrators met with Rachel, Nancy and Trooper Fry from the Pennsylvania State Police. (Ruddock Dep. at 71; Rougeaux Dep. at 94; Scanlon Dep. at 27.)[14] Nancy had brought in Trooper Fry after Mrs. Kokolis recommended that they call the State Police. (Nancy Dep. at 53-54; Scanlon Dep. at 28; Rachel Dep. at 80.)[15] At the meeting, Principal Ruddock and Vice Principal Rougeaux advised Rachel that she should have someone with her at all times in the school building and while going to her car. (Ruddock Dep. at 91-92; Rougeaux Dep. at 104.)[16]

Trooper Fry inquired about the School District's response to the weight room incident and indicated that he intended to file criminal charges against John Doe. (Ruddock Dep. at 71-

---

[12]The Rougeaux excerpt is in S.D.D. App. at 88.

[13]S.D.D. App. at 34, 35, 80.

[14]S.D.D. App. at pages 36, 81, 98. Unless otherwise identified, excerpts from the deposition of Patrick Scanlon are included in Plaintiffs' Appendix as Exhibit G.

[15]The Scanlon deposition excerpt is in S.D.D. App. at page 99.

[16]S.D.D. App. at 42-43, 86.

72.)[17]  Criminal charges were never filed.  Nancy indicated that Trooper Fry told her John Doe was too low functioning to understand the nature of the offenses.  (Nancy Dep. at 54.)  Mrs. Rebovich contends that she spoke to John Doe and told him he had to stay away from Rachel.  (Rebovich Dep. at 41, 48.)[18]  She also told John Doe's mother that he had to stay away from Rachel.  (Rebovich Dep. at 50-51.)[19]

On January 8, 2002, the School District assigned female aides to "tail" John Doe while he was in school so that he would be kept away from Rachel.  (Pretrial Stip. § III, ¶ 12; Kelley Dep. at 113; Ruddock Dep. at 86-87; Rougeaux Dep. at 60-61; Scanlon Dep. at 48-49.)[20]  Plaintiffs contend that John Doe's mother told Mrs. Rebovich that she did not think it would be sufficient if a female aide accompanied him and that a male aide should be assigned, but the school proceeded with its original plan.  (Pls.' App. Ex. Y.)  Also in January, the School District arranged for John Doe to be transported directly from his work assignment to his home at the end of the day in order to minimize his contact with Rachel.  (Pretrial Stip. § III, ¶ 13; Kelley Dep. at 51; Ruddock Dep. at 87, 89; Rebovich Dep. at 114; Rougeaux Dep. at 61, 102; Scanlon Dep. at 85-86.)[21]

On January 11, 2002, the School District advised its teachers and coaches, both verbally and via e-mail, that John Doe was to have no contact with Rachel.  (Pretrial Stip. § III, ¶ 14; Rebovich Dep. at 36, 43; Rougeaux Dep. at 59, 67, 68, 108, 143-44.)[22]  The School District also placed a behavior plan in John Doe's I.E.P. in January 2002.  (Pretrial Stip. § III, ¶ 15; Kelley Dep. at 114; Ruddock Dep. at 76; Rebovich Dep. at 36; Rougeaux Dep. at 67; Scanlon Dep. at

---

[17]S.D.D. App. at 36-37.

[18]S.D.D. App. at 66, 69.

[19]S.D.D. App. at 70-71.

[20]S.D.D. App. at 29, 39-40, 76-77, 102-03.  Unless otherwise identified, excerpts from Kathleen Kelley's deposition are included in Plaintiffs' Appendix as Exhibit H.

[21]S.D.D. App. at 23, 40-41, 72, 77, 85 and 108-09.

[22]S.D.D. App. at 65, 68, 75, 78, 79, 87, 89-90.

42-43.)[23]  No evaluation was performed when the plan was added to his I.E.P. again in January 2002.  This was the first time his I.E.P. and specifically his behavior plan made mention of his problem with Rachel or any other female student.  (Pls.' App. Exs. Q, R; Rebovich Dep. at 98.)

Nancy asked to be placed on the agenda to address the School Board at an upcoming meeting, but Superintendent Kelley instructed her instead to write a letter.  (Kelley Dep. at 21.) In the letter, dated January 23, 2002, Nancy reviewed the history of the situation and then stated that:

> District administrators have told me over the last year and a half, there is nothing more they can do, and that I needed to involve the state police.  I have contacted the state police and due to the low mental functioning of this student, charges are unable to be filed.  Therefore, in addition to the state police, a mental health agency and the district attorney's office have been brought in because the nature of this issue poses a harmful situation to students.  To many, this exhibits the district's inability to control the situation and to assure the safety of the Indiana Area school district children.
>
> I attempted to schedule a few minutes to address the school board, but Dr. Kelley discouraged me and asked instead that I address my concerns in a letter.  I am doing so now.  I have been teaching special education in this district for more than 25 years, so I am knowledgeable of the policies and procedures the district must follow regarding special education students.  I am also aware of the needs of the non-exceptional students to be assured of a safe learning environment.  I am requesting that this school board take the necessary steps to properly prepare and train district administrators and staff on how to handle students with non-compliant behavior.  I am hopeful that my daughter, and all concerned, can complete the year without further incidence.

(Pls.' App. Ex. J.)

In February 2002, Nancy sent a complaint to the Pennsylvania Department of Education which stated that the School District had failed to comply with special education laws and regulations as to John Doe and thereby exacerbated the situation with Rachel.  (ARIN App. Ex. O.)  The complaint was dismissed on March 1, 2002, because the Department could not address the issue of the handling of a special education student unless the parent or guardian of the student complained.  (Kelley Dep. at 146.)

Patrick Scanlon, Coordinator of Special Programs for the School District, was directed by the School District's Board of Directors to pursue an alternative placement for John Doe.

---

[23]S.D.D. App. at 30, 38, 65, 78, 100-01.

(Scanlon Dep. at 8-9.)[24]  He spoke to Rick Foust, Principal at Homer Center High School, to see if that neighboring school district would accept John Doe as a full-time student in its life skills program.  John Doe was already spending half a day at Homer Center in its work experience program.  (Kelley Dep. at 20; Ruddock Dep. at 111; Scanlon Dep. at 17-19, 21, 58, 60.)[25]  He did not use John Doe's real name or otherwise identify him.  (Kelley Dep. at 53; Scanlon Dep. at 60-61.)[26]

Prior to receiving a response, Mr. Scanlon went back to Mr. Foust and told him that the unnamed student was allegedly harassing a girl, that it was a liability issue for anyone who would take him and that he (Scanlon) hoped that Foust would say no.  (Scanlon Dep. at 62-65.)  Homer Center School District did not accept John Doe into its program.  (Kelley Dep. at 52-53; Scanlon Dep. at 65.)[27]  Mr. Foust was upset that he had not been told who the students were.  (Kelley Dep. at 18.)

Over the next several months, John Doe continued to return to school, even after he had been transported home after his work experience at Homer Center.  He hung around the parking lot.  On at least two occasions, Rachel ran into him in the hall and he had no "tail."  (Rachel Dep. at 95; Nancy Dep. at 64.)

In a meeting on March 4, 2002, the School District informed Nancy that it could not place John Doe in another school district, but it offered Rachel the option of being on homebound instruction.  (Pretrial Stip. § III, ¶ 16; Kelley Dep. at 154; Ruddock Dep. at 116; Rougeaux Dep. at 158-59.)[28]  Rachel and Nancy did not accept this offer.  (Kelley Dep. at 156; Ruddock Dep. at

---

[24]ARIN App. Ex. Q.

[25]S.D.D. App. at 22, 46, 94-96, 97, 104, 105.

[26]S.D.D. App. at 25, 105-06.

[27]The Kelley excerpt is in S.D.D. App. at pages 24-25.

[28]S.D.D. App. at 31, 47, 91-92.

117.)[29]  They further stated that the School District could not or would not provide instruction in

Rachel's two advanced placement classes. Rachel would have been forced to drop these classes,

which her guidance counselor said, would have jeopardized her acceptance to R.I.T.  (Rachel

Dep. at 97; Pls.' App. Ex. L.)

      Nancy's Transfer

      ARIN is a regional educational service agency under the Pennsylvania School Code

which provides educational services to eleven school districts within its geographical boundaries

of Armstrong County and Indiana County, Pennsylvania.  (Smith Arb. Hr'g. Test. at 41-43; Coad

Arb. Hr'g Test. at 137-38.)[30]  Nancy has been employed by ARIN as a Vision Specialist since

January 1976 and was assigned to provide vision services to students at various school districts

within the service umbrella of ARIN, including the Indiana Area School District.  She has

traveled to all eleven school districts in Indiana and Armstrong counties.  (Nancy Dep. at 8-15,

174.)[31]  However, she states that, as the most senior vision specialist, her preference for

assignment is to be considered first and factors such as geographical proximity are to be

considered.  (Nancy Aff. ¶ 3.)[32]

      On or about March 15, 2002, Superintendent Kelley made a verbal request to Dr. John T.

Smith, Director of Special Education for ARIN, to have Nancy reassigned out of the School

District.  Dr. Smith told Superintendent Kelley that she had to send a letter outlining her reasons

for the request, in accordance with the Collective Bargaining Agreement (CBA) between ARIN

and its teachers.   Dr. Smith immediately told Dr. Robert H. Coad, Executive Director of ARIN.

---

[29]S.D.D. App. at 32, 48.

[30]Excerpts from the testimony of John T. Smith and Robert H. Coad at the arbitration
hearing held on May 30, 2003 are included in ARIN's Appendix (Docket No. 40) as Exhibits A
and B, respectively.

[31]ARIN App. Exhibit C.

[32]Pls.' App. Ex. W.

(Smith Dep. at 29-31; Kelley Dep. at 80-88.)[33]  It was Superintendent Kelley's expectation that if she asked ARIN to reassign Nancy, her request would be honored.  (Pretrial Stip. § III, ¶ 17; Kelley Dep. at 159.)  Just before Superintendent Kelley made this request, Nancy told Dr. Smith about Rachel's on-going harassment problem and her efforts to remedy it.  (Nancy Dep. at 131-33; Smith Dep. at 32-34.)  Dr. Smith thought there might be some connection between Superintendent Kelley's request and the situation involving Nancy's daughter.  (Smith Dep. at 36.)

On April 13, 2002, Nancy submitted her annual request to ARIN to remain in her same assignment.  (Pls.' App. Ex. N.)  However, on May 10, 2002, Superintendent Kelley put her request to have Nancy transferred in writing.  The letter provided two reasons for the request:

> 1) Mrs. Jones does not have the appropriate certification to provide Orientation and Mobility Training, which is needed by our students; and 2) Mrs. Jones has not exercised prudent judgment in a situation involving her daughter.  She has breached student confidentiality, involved another school district inappropriately, made slanderous remarks about the administration in our district, and could not separate her personal life from her professional obligations.

(ARIN App. Ex. G.)  The comment about breaching confidentiality was a reference to Superintendent Kelley's belief that Nancy had discussed the possibility of John Doe attending Homer Center School District with Mr. Foust.  (Kelley Dep. at 14-15, 65, 79.)[34]

At Dr. Coad's direction, Dr. Smith investigated Superintendent Kelley's complaints.  He discovered that it was true that Nancy did not have orientation and mobility certification, but that she had already declared her intention to go back to school to obtain this certification and she had been bringing people into the district at no cost to provide orientation and mobility services to her students for years.  If there were students who needed these services, another ARIN employee could provide them to Nancy's students without removing her from the assignment.  This alternative would be raised during a meeting about the subject.  (Smith Dep. at 53-54, 82.)

Dr. Smith also investigated and found that Nancy had not breached confidentiality.  Mr.

---

[33]ARIN App. Ex. D.  Unless otherwise indicated, excerpts from the deposition of John T. Smith are included in Plaintiffs' Appendix at Exhibit C.

[34]S.D.D. App. at 20-21, 27, 28.

Foust told him there had been no breach and Dr. Smith agreed.  (Smith Dep. at 63, 65-66.)
Nancy denied ever having discussed the possibility of John Doe attending Homer Center with
Mr. Foust.  (Nancy Dep. at 76-77.)  Rather, she spoke with Mr. Foust on March 5, 2002, to
ascertain why he had refused to take the student (whom she did not identify) in Homer Center on
a full-time basis.  (Nancy Dep. at 74.)  She did this in response to Superintendent Kelley's
allegation, made on March 4, 2002, that Homer Center had refused to take John Doe all day
because Nancy "had shot off [her] mouth and everybody knew all about him, Homer Center had
said, no, they would not take him."  (Nancy Dep. at 122.)

On June 19, 2002, the day before a meeting to discuss the issue of Nancy's transfer,
Superintendent Kelley called Dr. Coad.  During this conversation, she told Dr. Coad that Nancy
had to say she made a mistake and that ARIN had to reprimand her because she "spread the
information to the district and the union" and had "stirred up that troubled labor pot in [the
School District]."  (Pls.' App. Ex. T.)

The CBA provides that ARIN has final authority concerning the assignment of its
employees to the various school districts which it serves.  It also contains a provision concerning
requests for reassignment of ARIN employees by member school districts which states that
ARIN is to meet with the affected employee and the school district in an attempt to resolve or
remediate the situation.  (CBA Art. XX, at 25-29.)[35]

In accordance with the CBA, meetings were held on June 20 and July 26, 2002, in order
to attempt to rectify the matter so that no transfer was necessary.  (Pretrial Stip. § III, ¶ 18; Nancy
Dep. at 140-65; Coad Dep. at 57-90; Smith Dep. at 70-102; Nancy Arb. Hr'g Test. at 98-113,
118-21, 173-82; Coad Arb. Hr'g Test. at 144-56; Smith Arb. Hr'g Test. at 66-81, 83-86, 111-
17.)[36]  Additionally, other conversations and negotiations ensued until late August, at which time

---

[35]ARIN App. Ex. F.

[36]These excerpts from Nancy's deposition are attached to ARIN's Appendix as Exhibit C
and the excerpts from the deposition of John T. Smith are attached to ARIN's Appendix as
Exhibit D.  Excerpts from the deposition of Robert H. Coad are attached to ARIN's Appendix as
(continued...)

a decision had to be reached as to staff assignments.  Despite these ongoing efforts, no resolution was reached.  (Pretrial Stip. § III, ¶ 19; Coad Dep. at 100-02; Coad Arb. Hr'g Test. at 169-72.)  ARIN honored Superintendent Kelley's request and on August 21, 2002, Nancy was notified that she had been transferred.  (ARIN App. Ex. J; Nancy Dep. at 141.)

On August 28, 2002, Nancy filed a grievance over the reassignment, claiming that it was discriminatory, disciplinary in nature and lacked just cause.  (ARIN App. Ex. K.)  After full hearings, the arbitrator rendered a decision on September 15, 2003, finding that ARIN had complied with the requirements of Section XX(c) of the CBA regarding requests for transfers and denied Nancy's grievance.  No appeal was filed.  (Pretrial Stip. § III, ¶ 20; ARIN App. Ex. L; Nancy Dep. at 81-82, 99.)[37]

Procedural History

Plaintiffs filed this action on July 17, 2003.  Count I alleges that the School District violated Rachel's rights under Title IX.  Count II alleges that the School District Defendants violated Rachel's right to bodily integrity under the substantive due process clause and her right to equal protection of the laws, both protected by the Fourteenth Amendment to the Constitution, and it is brought pursuant to 42 U.S.C. § 1983.  Count III alleges that Kelley and Ruddock subjected Rachel to the intentional infliction of emotional distress in violation of Pennsylvania law.  Count IV alleges that all Defendants retaliated against Nancy for exercising her First Amendment rights and it is brought pursuant to § 1983.  Finally, Count V alleges that Kelley subjected Nancy to the intentional infliction of emotional distress.

On December 30, 2004, a motion for summary judgment was filed by ARIN.  On January 3, 2005, a motion for summary judgment was filed by the School District Defendants.

_____

[36](...continued)
Exhibit H.  Excerpts from Nancy's testimony at the arbitration hearing on April 17, 2003 are attached to ARIN's Appendix as Exhibit I.

[37]ARIN App. Ex. C.

**III.   STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).


**IV.   DISCUSSION**

Count I - Title IX Claim

Title IX provides that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . . .

20 U.S.C. § 1681(a).   In Cannon v. University of Chicago, 441 U.S. 677 (1979), the Supreme Court held that Title IX is enforceable through an implied private right of action. The Court subsequently established that monetary damages are available in this private right of action. Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992).  In Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), the Court then held that a recipient of federal

education funds could be held liable and be required to pay damages where it was deliberately indifferent to known acts of sexual harassment by a teacher against a student.  Finally, in <u>Davis v. Monroe County Board of Education</u>, 526 U.S. 629 (1999), the Court held that individuals may sue for student-on-student sexual harassment if the federal funds recipient is aware of and deliberately indifferent to a sufficiently severe, pervasive and objectively offensive sexually hostile environment.[38]

The parties have stipulated that the School District is a recipient of federal education funds.  (Pretrial Stip. § III, ¶ 2.)  However, the School District argues that Plaintiffs have failed to proffer evidence that it was deliberately indifferent to Rachel's claims of harassment.  Rather, it contends that she did not notify the district about the harassment for a long time and that, once she did so, every time a complaint was made, the School District investigated it and took action.  Plaintiffs respond that the School District was notified of the harassment soon after it began and that its only response in each instance was to talk to John Doe, even though it was obvious that this method accomplished nothing.

### When Did the School District Have Actual Knowledge?

The Supreme Court in <u>Davis</u> did not expressly set out the standard for determining when a school district in a Title IX case has sufficient notice that harassment is taking place to be held liable for failing to respond appropriately.  The Court did contrast the school district's liability for its own failure to act with liability improperly based on agency principles, and held that liability attaches when the misconduct "takes place while the students are involved in school activities or otherwise under the supervision of school employees."  526 U.S. at 646 (quoting <u>Doe v. University of Ill.</u>, 138 F.3d 653, 661 (7th Cir. 1998)).  In <u>Doe</u>, the Seventh Circuit held that a school district is liable if "a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the [harasser] and the power to take action that would end such abuse and failed to do so."  <u>Id.</u> at 668 (internal quotation omitted).  Thus, the issue is whether a school official who possessed the requisite control over the situation

---

[38]There is no individual liability under Title IX.  <u>See</u> <u>Davis</u>, 526 U.S. at 641.

had actual knowledge of and was deliberately indifferent to the alleged harassment.  See Gebser, 524 U.S. at 291 (complaints from other parents to principal that teacher made inappropriate comments during class were insufficient to alert school district to the fact that teacher was involved in a sexual relationship with Gebser).

The Court of Appeals for the Tenth Circuit examined this issue in depth and stated that:

> We decline simply to name job titles that would or would not adequately satisfy this requirement. "[S]chool districts contain a number of layers below the school board: superintendents, principals, vice-principals, and teachers and coaches, not to mention specialized counselors such as Title IX coordinators. Different school districts may assign different duties to these positions or even reject the traditional hierarchical structure altogether."  Because officials' roles vary among school districts, deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry.  Davis makes clear, however, that a school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision, would meet this definition.

Murrell v. School Dist. No. 1, Denver, Col., 186 F.3d 1238, 1247 (10th Cir. 1999) (quoting Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 660 (5th Cir. 1997)).

The School District contends that it did not have knowledge until a complaint was made to Vice Principal Kokolis when Rachel was in eleventh grade.  Plaintiffs respond that Rachel's teachers and guidance counselors and John Doe's special education teachers were made aware of the situation as early as when Rachel and John Doe were in eighth grade.

The parties have stipulated that the School District had a written discipline policy prohibiting peer-on-peer harassment and sexual harassment, that this policy prohibited any student from communicating terroristic threats to another student, that the policy applied to all students, that Rodney Ruddock as principal of the high school was responsible for discipline in the high school, and that the high school had three different assistant principals in school years 1999-2000, 2000-2001 and 2001-2002 to whom Principal Ruddock delegated many of the disciplinary matters.  (Pretrial Stip. § III, ¶¶ 3-5, 8-9.)  Plaintiffs note that the School District's 1998 sexual harassment policy states that "Any person who alleges sexual harassment by any staff member or student in the district may use the district's complaint procedure or may complain directly to his/her immediate supervisor, building principal, guidance counselor or

16

other individual designated to receive such complaints." (Pls.' App. Ex. U, 1998 Policy at 7.)
The 1999 policy states that:

> When a student believes that he/she is being harassed, the student is encouraged to inform the harasser that his/her behavior is unwelcome, offensive, or inappropriate.  Students may choose to report harassment complaints to the building principal or other administrator, a faculty member, the nurse, or other responsible adult, following the harassment policy's complaint procedure.  All employees who receive harassment complaints from a student shall report such to the building principal.

(Id., 1999 Policy at 17.)  The same language appears in the 2001 policy.  (Id., 2001 Policy at 10-11.)

The School District has not argued that the people to whom Plaintiffs complained were not designated to receive such complaints.  Pursuant to the policies of the School District, Plaintiffs appropriately reported John Doe's conduct to teachers, guidance counselors and vice principals, who should have conveyed these reports to the building principal.  Therefore, Plaintiffs have demonstrated that officials with sufficient control had actual knowledge of John Doe's harassment of Rachel beginning when she was in eighth grade.

Was the School District Deliberately Indifferent?

The School District further contends that Plaintiffs have failed to demonstrate that its actions constituted deliberate indifference to Rachel's situation merely because they were ineffective in remedying it.  Plaintiffs respond that, every time the School District received a complaint, it either did nothing or merely spoke to John Doe, long after it was obvious that this approach accomplished nothing.

The Supreme Court stated in Davis that a school district is not required to purge its schools of actionable peer harassment and that administrators are not required to engage in any particular disciplinary action.  526 U.S. at 548.  Victims of peer harassment do not have the right to request a particular remedial demand.  Id.  Rather, the school district "must merely respond to known peer harassment in a manner that is not clearly unreasonable."  Id. at 649.  The Court concluded that, in an appropriate case, on a motion to dismiss or for summary judgment or for a directed verdict, a court may identify a response as not "clearly unreasonable" as a matter of law.  Id.  Although the Court did not resolve the issue in Davis, it noted that the school district's

17

response to a male students's fondling and suggestive behavior toward a female student, which

did not include disciplining the student, separating him from her or establishing a sexual

harassment policy or procedure, could suggest deliberate indifference.  Id. at 654.

In Vance v. Spencer County Public School District, 231 F.3d 253 (6th Cir. 2000), the

court rejected the suggestion of school district ("Spencer") that, as long as it "does something in

response to harassment, it has satisfied the standard."  Id. at 260.  Rather, it stated that

> where a school district has knowledge that its remedial action is inadequate and
> ineffective, it is required to take reasonable action in light of those circumstances
> to eliminate the behavior.  Where a school district has actual knowledge that its
> efforts to remediate are ineffective, and it continues to use those same methods to
> no avail, such district has failed to act reasonably in light of the known
> circumstances.

Id. at 261.  The court concluded that Spencer

> failed to respond in light of the known circumstances.  On one occasion, a
> student's harassing conduct culminated in stabbing Alma in the hand.  With the
> exception of talking to the student, there was no evidence before the jury or this
> Court that Spencer took any other action whatsoever.  On another occasion, two
> male students held Alma while another took off his pants and others pulled her
> hair and attempted to rip off her clothes.  With respect to that incident, the only
> evidence before the jury evincing Spencer's response is that a class room teacher
> spoke to the boys and Alma.  There is no evidence before this Court that Spencer
> ever disciplined the offending students nor informed law enforcement as a result
> of any of these incidents.  On yet another occasion, Alma's mother filed a detailed
> complaint with Spencer's Title IX coordinator.  An investigation, however, never
> resulted.  These three incidents alone reflect a deliberate indifference in light of
> the known circumstances.
>
> Furthermore, in numerous instances, Spencer continued to use the same
> ineffective methods to no acknowledged avail.  Although "talking to the
> offenders" produced no results, Spencer continued to employ this ineffective
> method....
>
> In the instant case, Spencer responded to several of Alma's complaints by
> "talking" to the offenders.  However, the harassing conduct not only continued but
> also increased as a result.  In fact, some of Alma's offenders confronted her after
> they had been "talked" to in order to harass Alma again.... [O]nce Spencer had
> knowledge that its response was inadequate, it was required to take further
> reasonable action in light of the circumstances to avoid new liability.

Id. at 262.  See also Murrell, 186 F.3d at 1243 (in a series of incidents involving the sexual

assault of a female special education student by a male student, the school district ignored the

behavior, failed to tell the plaintiff's parent about it, urged the plaintiff not to tell anyone and

undertook no investigation or discipline and this constituted deliberate indifference).

18

In this case, as in <u>Vance</u>, it appears that, at least until the weight room incident in December 2001, the School District's response to John Doe's behavior consisted entirely of "talking to" him, changing his homeroom and moving his locker, even though these responses did not accomplish anything.  No behavior plans were placed in John Doe's I.E.P. and the one that was there was removed in March 2001, during the time that he was harassing Rachel.  The School District's response to the serious incident in September 2001 in which John Doe held onto the door handle of Rachel's car and banged on the glass as she attempted to get away was either nonexistent (contending that it could do nothing because the incident occurred off school grounds) or another attempt to "talk to him," which had proved ineffective for the previous four years.

It was not until after the December 2001, incident in the weight room that the School District began taking actions such as assigning aides to "tail" John Doe, transporting him directly from his work assignment to his home, pursuing the idea of transferring him to another school district and proposing the notion of homebound instruction for Rachel.  The Court is unable to find the School District's responses from 1997 until December 2001 as "not clearly unreasonable as a matter of law."  Therefore, the motion for summary judgment as to Count I will be denied.

### Counts II, IV - Section 1983 Claims

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.  Thus, to establish a claim under this statute, "a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under color of state law."  <u>Nicini v. Morra</u>, 212 F.3d 798, 806 (3d Cir. 2000) (en banc).  Plaintiffs allege that Defendants violated Rachel's rights to bodily integrity and equal protection of the laws (Count II) and that they violated Nancy's rights under the First Amendment by retaliating against her for exercising her right of free speech (Count IV).

19

<u>Count II - Rachel's Equal Protection and Due Process Claims</u>

In Count II, Plaintiffs allege that Rachel's rights to equal protection and due process were violated.  The parties have stipulated that the School District Defendants were at all times relevant hereto acting under color of state law.  (Pretrial Stip. § III, ¶ 1.)  However, the School District Defendants argue that: 1) Rachel's § 1983 claims are subsumed by the Title IX claim in Count I; 2) Rachel has come forward with no evidence to support an equal protection claim; and 3) she cannot maintain a substantive due process claim arising out of John Doe's interference with her right to bodily integrity because the underlying acts were committed by a private actor.

<u>Does Title IX Subsume Rachel's § 1983 Claims?</u>

The School District Defendants argue that Rachel's § 1983 claims, which arise out of the same conduct that forms the basis of her Title IX claim, are "subsumed" by Title IX and otherwise barred by the doctrine set forth in <u>Middlesex County Sewerage Authority v. National Sea Clammers Association</u>, 453 U.S. 1 (1981).  In <u>Sea Clammers</u>, the Supreme Court held that "when a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirement of that enforcement procedure may not be bypassed by bringing suit directly under § 1983."  <u>Id.</u> at 20 (internal quotation omitted).

The Court of Appeals has held that Title IX subsumes § 1983 claims against state officials acting in their official capacities.  <u>Pfeiffer v. Marion Ctr. Area Sch. Dist.</u>, 917 F.2d 779, 789 (3d Cir. 1990); <u>Williams v. School Dist. of Bethlehem, Pa.</u>, 998 F.2d 168, 176 (3d Cir. 1993).[39]  Plaintiffs argue that Rachel's § 1983 claims exceed the scope of the Title IX claim against the School District.  However, the court did not distinguish the claims on this basis and Plaintiffs point to no authority that would support such a distinction.

Plaintiffs also argue that Kelley and Ruddock may be held liable in their individual

---

[39]There is a split of authority on this issue.  Some circuits have come to the same conclusion as <u>Pfeiffer</u>.  <u>See</u> <u>Bruneau ex rel. Schofield v. South Kortright Central Sch. Dist.</u>, 163 F.3d 749, 756-59 (2d Cir. 1998); <u>Waid v. Merrill Area Public Schools</u>, 91 F.3d 857, 862 (7th Cir. 1996).  <u>But see</u> <u>Crawford v. Davis</u>, 109 F.3d 1281, 1283-84 (8th Cir. 1997); <u>Seamons v. Snow</u>, 84 F.3d 1226, 1233-34 (10th Cir. 1996); <u>Lillard v. Shelby Cty. Bd. of Educ.</u>, 76 F.3d 716, 722-24 (6th Cir. 1996) (all rejecting <u>Pfeiffer</u>).

capacities.  The Court of Appeals has not addressed this issue.  The Supreme Court explicitly

stated in <u>Gebser</u> that its decision "does not affect any right of recovery that an individual may

have ... against the teacher in his individual capacity under state law or under 42 U.S.C. § 1983."

524 U.S. at 292.  The Court of Appeals for the Seventh Circuit has examined this issue and

concluded that § 1983 suits against individuals in their individual capacities are not subsumed by

Title IX.  <u>Delgado v. Stegall</u>, 367 F.3d 668, 673-75 (7th Cir. 2004).  <u>See also</u> <u>Miller v. Kentosh</u>,

No. Civ. A. 97-6541, 1998 WL 355520, at *3 (E.D. Pa. June 29, 1998).  Thus, to the extent that

Count II alleges claims against the School District and Ruddock and Kelley in their official

capacities, it must be dismissed based on the <u>Sea Clammers</u> doctrine.  However, to the extent that

Count II alleges claims Ruddock and Kelley in their individual capacities, the <u>Sea Clammers</u>

doctrine does not bar the claims.

 The Fourteenth Amendment provides that states shall not "deprive any person of life,

liberty, or property, without due process of law; nor deny to any person within its jurisdiction the

equal protection of the laws."  U.S. Const. Amend. XIV.  Plaintiffs allege that the actions of

Kelley and Ruddock violated the equal protection clause and the substantive due process clause

by depriving Rachel of her liberty interest in bodily integrity.  As the Supreme Court has

explained, it is "the substantive component of the Clause that protects individual liberty against

'certain government actions regardless of the fairness of the procedures used to implement

them.'"  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992) (quoting <u>Daniels v.</u>

<u>Williams</u>, 474 U.S. 327, 331 (1986)).  In <u>Collins</u>, the Supreme Court clarified that "proper

analysis requires us to separate two different issues when a § 1983 claim is asserted against a

municipality:  1) whether plaintiff's harm was caused by a constitutional violation, and 2) if so,

whether the city is responsible for that violation."  <u>Id.</u> at 120.

 <u>Substantive Due Process Claim</u>

 The Supreme Court has held that individuals "have a liberty interest in their bodily

integrity that is protected by the Fourteenth Amendment."  <u>Black by Black v. Indiana Area Sch.</u>

<u>Dist.,</u> 985 F.2d 707, 709 n.1 (3d Cir. 1993) (citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315

(1982) and <u>Ingraham v. Wright</u>, 430 U.S. 651, 673-74 (1977)).  In <u>D.R. by L.R. v. Middle Bucks</u>

Area Vocational Technical School, 972 F.2d 1364, 1368 (3d Cir. 1992) (en banc), a minor child (D.R.) alleged that several male students in a graphic arts class physically, verbally and sexually abused her over the course of a school year by grabbing her and forcing or carrying her into a unisex bathroom or a darkroom, both of which were part of the graphic arts classroom. Although D.R. did not report these incidents to the student teacher, Susan Peters, she alleged that "Peters was or should have been in the classroom during the time of the acts complained of and either heard or should have heard the incidents taking place." Id. at 1366. In addition, a public high school student alleged that, after another student attempted to force her into the bathroom, she reported this incident to the assistant director of the school, but he failed to take any corrective action. The court held that the students possessed a liberty interest in their own bodily integrity but, as discussed below, none of the theories that the plaintiffs articulated were sufficient to impose liability on the state.

In Collins, the Supreme Court rejected a claim asserted on behalf of a sanitation worker who died of asphyxia after entering a manhole to unstop a sewer line because "the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimum levels of safety and security in the workplace." 503 U.S. at 130. As the Supreme Court has stated:

> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them.

DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196-97 (1989) (citations and footnote omitted). Thus, no liability attached when county authorities, although aware that Joshua DeShaney might be a victim of child abuse, nevertheless placed him in the custody of his father, who beat him to the point that he suffered brain damage so severe that he was expected to spend the rest of his life confined to an institution for the profoundly retarded.

Plaintiffs do not argue that School District officials are obligated under the Due Process Clause to provide a school environment free from sexual harassment by other students; such an

22

argument would have to be rejected on the basis of <u>Collins</u> and <u>DeShaney</u>.  They also concede that the Court of Appeals held in <u>D.R.</u> that the "special relationship" exception to the general proposition that the state does not have a duty to protect its citizens from the actions of others does not apply to a school setting.  972 F.2d at 1372.  However, they argue that the "state-created danger" theory applies in this case.

State-Created Danger Theory of Liability

The Court of Appeals has noted that:

> In <u>DeShaney</u>, the Supreme Court left open the possibility that a constitutional violation might have occurred despite the absence of a special relationship when it stated: "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."

<u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1205 (3d Cir. 1996) (quoting <u>DeShaney</u>, 489 U.S. at 201).  In <u>Kneipp</u>, the police stopped the Kneipps one-third of a block from their home because they were causing a disturbance on the highway.  Because he wanted to relieve the babysitter watching his son, Joseph Kneipp asked if he could go home, assuming that the police would take his wife Samantha, who was extremely intoxicated and could not walk on her own, either to a hospital or the police station.  However, the police sent Samantha home alone and, when she was discovered hours later, she had fallen and suffered brain damage from the cold.

The Court of Appeals in <u>Kneipp</u> adopted a four-part test for the state-created danger theory, as set forth in <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1152 (3d Cir. 1993):

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

95 F.3d. at 1208.  The court held that a jury could have found Samantha Kneipp's injuries were foreseeable given her seriously impaired state, that the police acted in willful disregard of her condition by sending her home, that they exercised sufficient control over her to establish a relationship (which is not the same as the custodial situation required for special relationship liability), and that "the police officers used their authority as police officers to create a dangerous situation or to make Samantha more vulnerable to danger had they not intervened."  <u>Id.</u> at 1209.

See also Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989) (police officer stranded a female passenger of a drunk driver in a high-crime area late at night and she was raped); Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989) (town assigned prison inmates to work at town hall, and the plaintiff was abducted and held hostage for three days).

The Court of Appeals has made certain refinements to this test in recent years.  After the Supreme Court discussed the standard of liability for police high-speed pursuit cases in County of Sacramento v. Lewis, 523 U.S. 833 (1998), the Court of Appeals suggested that the "shocks the conscience" standard, rather than deliberate indifference, was applicable to all substantive due process claims.  Miller v. City of Philadelphia, 174 F.3d 368, 374-75 (3d Cir. 1999).  However, the court also indicated that the precise degree of wrongfulness required to reach the level of conscience-shocking behavior depends on the circumstances of a particular case and that when an official has "the luxury of proceeding in a deliberate fashion," id. at 375-76, acts that could be described as deliberately indifferent might suffice.  In Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997), the court held that the third element ultimately depends on whether the plaintiff was a foreseeable victim, id. at 914, and that, with respect to the fourth element–creating the opportunity–"the dispositive factor appears to be whether the state has in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission."  Id. at 915.  See Rivas v. City of Passaic, 365 F.3d 181, 195-97 (3d Cir. 2004); Estate of Smith v. Marasco, 318 F.3d 497, 507-10 (3d Cir. 2003).

Plaintiffs may be able to satisfy the first three elements of the state-created danger theory: 1) the harm to Rachel was foreseeable and fairly direct given the repeated incidents and their complaints to the School District; 2) Kelley and Ruddock, who were not responding to an emergency situation and had years in which to respond, could be said to have acted in willful disregard for Rachel's safety by failing to take action or by continuing to take action that they knew to be ineffective; and 3) Rachel was a foreseeable victim based upon the history of John Doe's harassment of her.

However, Plaintiffs cannot meet the fourth element of the state-created danger theory.  In

D.R., the court concluded that a state-created danger theory (which it had not yet recognized) could not be applied because the school district took no affirmative action to create or increase the students' risk of danger.  The plaintiffs noted that the school district had a unisex bathroom with a lock on it and a darkroom with a lock on it, but the harassment could have occurred even if the school room had two bathrooms and the locks were there for a proper purpose.  The plaintiffs alleged that the class was placed under the supervision of an inadequately trained and supervised student teacher, but the court held that this act increased the risk of the students' receiving a poor education, not the kind of harm they suffered.  The plaintiffs alleged that the state actors failed to report the incidents to parents or other individuals in authority, but the court held that this duty arose under state law, and the violation of state-law duties is not sufficient to state a claim under § 1983.  Finally, the plaintiffs alleged that the defendants had failed to investigate and stop the misconduct, but the court held that these allegations indicated only nonfeasance, rather than affirmative acts of misfeasance which would be actionable.  972 F.2d at 1374-75.

In the Morse case, the Court of Appeals held that the school district did not place a teacher in a dangerous environment stripped of means to defend herself and did not place her in a unique confrontational encounter when it allowed construction workers to use an unlocked back entrance to the school building, and a mentally unstable woman entered through this door and shot her.  It did increase the risk of harm, but this was not sufficient and the increased risk did not relate directly to the harm the teacher suffered. 132 F.3d at 914-15.  See also Page by Page v. School Dist. of Phila., 45 F. Supp. 2d 457, 465 (E.D. Pa. 1999) (school officials did not meet fourth element when they failed to prevent attack on middle school student by other students, even when they had entered into an agreement with the parents of the victim to prevent her from being harmed). Cf. Maxwell by Maxwell v. School Dist. of City of Phila., 53 F. Supp. 2d 787, 793 (E.D. Pa. 1999) (special education student met fourth element when school district defendants locked the classroom door, preventing her from leaving, teacher told disruptive students they could do what they wanted as long as they did not bother her, the teacher witnessed the attempted rape of another student but did nothing, and the teacher saw two students take

25

plaintiff and a blackboard to the back of the room where they raped her, but the teacher did nothing).

In this case, Ruddock and Kelley cannot be said to have placed Rachel in a more dangerous situation. Plaintiffs argue that these individuals used their authority to create an opportunity that otherwise would not have existed for John Doe's harassing conduct to take place. However, the record does not support this argument. Rather, Plaintiffs have demonstrated only that Ruddock and Kelley may not have done enough to prevent Rachel from being harmed once they knew of the threat, not that they increased the danger by, for example, locking her in a room with John Doe or telling Doe he could do what he wanted. Thus, this situation resembles the scenarios in D.R., Morse and Page, not the situation in Maxwell, in which school officials took additional measures that increased the harm to the minor student. Therefore, Plaintiffs cannot maintain a substantive due process claim against Kelley and Ruddock for violating Rachel's right to bodily integrity pursuant to the state-created danger theory of liability.

Equal Protection Claim

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)).

The Court of Appeals for the Third Circuit has stated that a court's "first step in evaluating a claim that a law or government action violates the Equal Protection Clause is to determine the appropriate standard of review." Donatelli v. Mitchell, 2 F.3d 508, 513 (3d Cir. 1993) (citation omitted). The more rigorous "strict scrutiny" test, under which a challenged state action will be upheld only if it advances a compelling state interest and is narrowly tailored to meet that interest, has generally been applied to two types of equal protection claims:

> (1) where the challenged action or legislation involves a "suspect" classification, i.e. a classification based on race, alienage, or national origin; and (2) where the challenged action infringes on fundamental constitutional rights, such as the right to travel or rights protected by the First Amendment. Strict scrutiny is applied in such cases because classifications that are based on race or that infringe on

fundamental constitutional rights, are presumptively invalid and will not often be justified by a legitimate state interest.

Id. (citations omitted).

In City of Cleburne, Texas v. Cleburne Living Center, Inc., 473 U.S. 432, 442-43 (1985), the Supreme Court specifically held that mental retardation is not "a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation."  Thus, special education student is not a category requiring a higher standard of review.

Plaintiffs contend that Rachel received different treatment because she was a regular education student and John Doe was a special education student.  Plaintiffs point to evidence that the school administrators admitted they "could do nothing" to John Doe because he was a special education student.  (Rachel Dep. at 88; Nancy Dep. at 44.)  However, they cite no authority that would support the argument that special education students (or non-special education students) constitute a suspect class.  See, e.g., Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130, 1134-35 (9th Cir. 2003) (former students who were harassed were members of an identifiable class for equal protection purposes because they alleged discrimination on the basis of sexual orientation).  In addition, their focus is on John Doe's class, not Rachel's.

Moreover, the School District Defendants note that Plaintiffs have not supported their equal protection claim in any event because they have not referred to any other incidents in which the students who were harassed received more favorable responses from school officials than Rachel did.  Although Plaintiffs have argued that Rachel received unequal protection of the laws, they have cited no evidence to support this claim.  Therefore, they cannot maintain an equal protection claim based on these facts.

Count IV - Nancy's First Amendment Retaliation Claim

In Count IV, Plaintiffs allege that Defendants retaliated against Nancy for exercising her First Amendment right of free speech.  As summarized by the Court of Appeals for the Third Circuit:

A public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step process.  First, plaintiff must establish the activity in

question was protected. For this purpose, the speech must involve a matter of public concern. Connick [v. Myers], 461 U.S. [138,] 147 [(1983)]. Once this threshold is met, plaintiff must demonstrate his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees. Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (requiring courts to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"). These determinations are questions of law for the court.

If these criteria are established, plaintiff must then show the protected activity was a substantial or motivating factor in the alleged retaliatory action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Lastly, the public employer can rebut the claim by demonstrating "it would have reached the same decision ... even in the absence of the protected conduct." [Id.]. The second and third stages of this analysis present questions for the fact finder...

Baldassare v. State of N.J., 250 F.3d 188, 194-95 (3d Cir. 2001) (other citations omitted).

Defendants argue that: 1) Nancy's speech did not address a matter of public concern; and 2) she has failed to demonstrate the existence of a policy, practice or custom. In addition, ARIN argues that: 1) Nancy's interests do not outweigh those of ARIN or the School District; 2) her reassignment was not motivated by her speech; 3) her reassignment does not rise to the level of an adverse employment action; and 4) the provisions in the CBA pertaining to reassignment of ARIN employees act as a waiver to her First Amendment claim.[40]

Matter of Public Concern

"A public employee's speech involves a matter of public concern if it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Green v. Philadelphia Housing Auth., 105 F.3d 882, 885-86 (3d Cir. 1997) (quoting Connick 461 U.S. at 146). "This determination turns on the content, form and context of the public employee's speech." Id. at 886 (citing Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995)). "The content of the speech may help to characterize it as relating to a matter of social or

---

[40]ARIN also argues that Nancy has failed to establish a protected property interest, and therefore she cannot maintain a due process claim, and she is not entitled to punitive damages. Plaintiffs do not address the first argument and it would appear that the reference to the due process clause in Count IV was inadvertent. They concede the second argument and the Court will grant ARIN's motion with respect to Plaintiffs' request for punitive damages.

political concern of the community if, for example, the speaker seeks to 'bring to light actual or potential wrongdoing or breach of the public trust' on the part of government officials." <u>Holder v. City of Allentown</u>, 987 F.2d 188, 195 (3d Cir. 1993) (quoting <u>Connick</u>, 461 U.S. at 147-48).

The Court of Appeals has held that a court must "determine if the speech related to matters of public concern, or constituted merely personal grievances." <u>Feldman v. Philadelphia Housing Auth.</u>, 43 F.3d 823, 829 (3d Cir. 1994) (citing <u>Connick</u>, 461 U.S. at 147; <u>Pickering</u>, 391 U.S. at 568). Or, as phrased somewhat differently, "speech by public employees is deemed to be speech about public concern when it relates to their employment so long as it is not speech 'upon matters of only personal interest.'" <u>Swineford v. Snyder County, Pa.</u>, 15 F.3d 1258, 1271 (3d Cir. 1994) (quoting <u>Czurlanis v. Albanese</u>, 721 F.2d 98, 103 (3d Cir. 1983)).

Plaintiffs argue that Nancy raised a matter of public concern protected by the First Amendment. They note that she referred to complaints raised by other parents about John Doe's behavior and that her concerns touched upon the larger issues of whether children in the school were being adequately protected and whether the School District was adhering to its own policies regarding harassment. She brought in the State Police to investigate and filed a complaint with the State Department of Education. In addition, because Nancy was an employee of ARIN and not the School District, her complaints about the School District's alleged failures cannot be construed as personal gripes by an employee about her employer.

In <u>Rankin v. McPherson</u>, 483 U.S. 378 (1987), the Supreme Court concluded that a clerical employee in a county office was speaking on a matter of public concern when, after hearing of an attempt on the life of the President, she remarked "If they go for him again, I hope they get him." The Court noted that the statement was made in the course of a conversation addressing the policies of the President's administration and that it came on the heels of a news bulletin regarding a matter of heightened public attention: an attempt on the life of the President. <u>Id.</u> at 386-87. <u>See also</u> <u>Brennan v. Norton</u>, 350 F.3d 399, 414-16 (3d Cir. 2003) (firefighter's protests about closing of two fire stations, opposition to replacing of an official position with a civilian and informing New Jersey Department of Labor and Health about the presence of asbestos in the fire stations all involved matters of public concern).

The Court concludes that Plaintiffs have demonstrated that Nancy was raising issues of public concern.  Although she obviously wanted the School District to take action to ensure Rachel's safety, her complaints raised larger issues of public concern such as safety in the school and whether the School District was following its announced policies regarding sexual harassment and the treatment of special education students.

Nancy's Interests Versus Interests of School District and ARIN

ARIN argues that Nancy's interests are outweighed by those of the School District and its own.  It cites an e-mail message sent to Vice Principal Rougeaux, in which Nancy stated that she told Mr. Foust of Homer Center that "if this happened to two other girls in Rachel's senior class, Kate Antis or Olivia Hatcher, it would have been resolved years ago."  (ARIN App. Ex. P.) ARIN notes that Kate Antis is the daughter of the Assistant Superintendent of the School District and Olivia Hatcher is the daughter of a School Board member.  Superintendent Kelley relates that the parents of these students were extremely upset over this communication.  (Kelley Dep. at 102-07.)[41]

ARIN also noted that Dr. Coad, its Executive Director, stated that Superintendent Kelley told him that if Nancy was not reassigned, the School District would discontinue using ARIN for its vision services.  (Coad Dep. at 101-04, 133-35.)  Superintendent Kelley indicated that she did not recall making this statement to Dr. Coad.  (Kelley Dep. at 179.)  Thus, ARIN argues that its interests in promoting the efficiency of the public services it provides outweigh Nancy's interests in making the statements.

The Court of Appeals has stated that:

we must consider the nature of the relationship between the employee and the employer as well as any disruption the employee's speech may cause, including the impact of the speech on the employer's ability to maintain discipline and relationships in the work place.  "In calibrating the significance of the disruption, the relationship between the employer and the employee is particularly important."  Of course, the right of expression would mean little if an employee could be silenced whenever his/her voice caused any degree of disruption or discomfort for a public employer.  Therefore, the balancing cannot be "controlled by a finding that disruption did or could occur."  A public employee's speech "no

---

[41]ARIN App. Ex. E.

doubt may disrupt and demoralize much" of the public workplace.  However, the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace.  Rather, any disruption is "only [a] weight[ ] on the [balancing] scale."

Brennan, 350 F.3d at 413-14 (quoting Baldassare, 250 F.3d at 198, 200).

The fact that parents of two students in the School District were upset by Nancy's comment does not mean that her interests were outweighed by those of the School District, particularly since her employer was ARIN.  With respect to the possibility of the School District discontinuing ARIN's services if the request for Nancy's transfer was not granted, this fact is disputed.  Therefore, the Court cannot say as a matter of law that the interests of ARIN and the School District outweigh Nancy's interest in her speech.

Was Nancy's Reassignment Motivated By Her Speech?

ARIN argues that it complied with the requirements of the CBA and transferred Nancy in accordance with the School District's request.  It also contends that the reason for the transfer was the inability of the parties to work out some deal to alleviate the request for a transfer.  Therefore, it contends that its actions were not motivated by her speech.

Plaintiffs have proffered evidence that ARIN was aware of the background behind the request for the transfer.  They have proffered evidence that Dr. Smith investigated the reasons Superintendent Kelley provided and found that they were not supported.  Dr. Smith also admitted that, if alternatives and remedial measures are not effective, ARIN will honor a school district's request for a transfer.  (Smith Dep. at 42-44.)  Dr. Coad's notes from June 19, 2002, the day before the first meeting to attempt remediation regarding Nancy's transfer, present additional factual support for Plaintiffs' claim that ARIN was fully aware that Superintendent Kelley requested Nancy's transfer in retaliation for her speech on matters of public concern.  (Pls.' App. Ex. T.)  The fact that ARIN complied with the provisions of the CBA in honoring Superintendent Kelley's request for her transfer does not mean that the decision was not motivated by her speech.  ARIN is correct on one level that the transfer occurred because the parties were unable to work out a deal to alleviate the need for a transfer, but there are genuine issues of material fact as to whether ARIN made its decision while it was aware of the motivation for the request.

31

<u>Adverse Employment Action</u>

ARIN argues that Nancy did not suffer an "adverse employment action" because her transfer did not change her salary or benefits.  Plaintiffs respond that Nancy had to pay for some additional time and mileage and that she does not have to demonstrate an adverse employment action for purposes of a First Amendment retaliation case.

Nancy concedes that the reassignment did not affect her salary, benefits, position or title at her job.  (Nancy Dep. at 82-83; Coad Arb. Hr'g Test. at 159-60.)  ARIN contends that, as an itinerant vision consultant, she was required to go where she was needed, where the vision students were and this changed in her 26-plus years as a vision consultant.  (Nancy Dep. at 8-15; Nancy Arb. Hr'g Test. at 139-42, 156-57.)[42]  Nancy responded that, as the most senior vision specialist, her preference for assignment was to be honored first.  (Nancy Dep. at 83.)

In every school year going back to 1999, Nancy's assigned districts, and therefore travel time and mileage, have changed.  (Pls.' Resp. ARIN Interrog. Nos. 1-4.)[43]  She is compensated for her mileage by ARIN.  (Nancy Dep. at 82.)  However, Nancy's compensation is based on distance from either her home or her ARIN office to her first assignment, whichever is shorter. She stated that, based on needs of students and schedule changes, this sometimes resulted in uncompensated mileage or time.  (Nancy Aff. ¶ 4.)

ARIN's citations are to Title VII employment cases, in which courts have held that an employee must demonstrate that she suffered an adverse employment action in order to recover. <u>See, e.g.</u>, <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 431 (3d Cir. 2001).  However, in the context of a First Amendment retaliation case, the Court of Appeals has held that:

> A public employer "adversely affects an employee's First Amendment rights when it ... makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights."  "On the other hand, courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands."

_____

[42]These excerpts from Nancy's deposition are attached to ARIN's Appendix as Exhibit C.

[43]ARIN App. Ex. R.

Brennan, 350 F.3d at 419 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000)).

Nancy's claim is a First Amendment retaliation claim.  Therefore, she does not have to demonstrate that she suffered an adverse employment action.  Her involuntary transfer out of the School District in response to her speech on a matter of public concern is sufficient for purposes of her claim.

Did the CBA Waive Nancy's Right to Bring Her Claim?

ARIN also argues that the CBA waived Nancy's right to bring her First Amendment claim.  It notes that she was on the committee that drafted the relevant portion of the agreement. Plaintiffs contend, however, that the CBA does not discuss First Amendment claims and Nancy was not present when this provision was inserted.

Nancy is a union officer and served on the negotiating committee for the last two union contracts with ARIN.  (Nancy Dep. at 89-99.)[44]  The provision concerning the school district providing reasons for a requested involuntary transfer were added during the last negotiating sessions in 2000.  (ARIN App. Ex. S.)  However, Nancy was not at the table during that session. (Nancy Dep. at 94.)

As outlined above, in a First Amendment retaliation case, a public entity is prohibited from taking action that would otherwise be permitted if the motivation is to retaliate against an employee for having exercised a protected right.  The CBA does not waive Nancy's First Amendment rights, nor does ARIN's compliance with CBA provisions determine the issue of whether her involuntary transfer constituted retaliation for her having exercised her right to freedom of speech.  Indeed, the arbitrator specifically stated that the CBA "does not address the sufficiency of the reason or reasons, it merely states that the reasons must be provided to the Grievant."  (ARIN App. Ex. L at 11.)

Policy, Practice or Custom

Defendants argue that Plaintiffs have failed to demonstrate the existence of a policy,

---

[44]ARIN App. Ex. C.

practice or custom that deprived Nancy of some federally secured right. ARIN notes that they allege only that it had a policy of honoring a school district superintendent's request to transfer one of its employees. The School District contends that they have not alleged that it had a policy, practice or custom of transferring employees in violation of their rights or that it was the moving force behind any deprivation.

> The Supreme Court has long held that:

> A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978). "Policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Kniepp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). Customs are "'practices of state officials ... so permanent and well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 691). In addition, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

The record establishes that Superintendent Kelley requested that ARIN transfer Nancy, that attempts at remediation were made and failed ,and that Dr. Coad, Executive Director of ARIN, ultimately complied with Kelley's request. Plaintiffs have also proffered evidence that ARIN was aware of the situation involving Rachel. Defendants have not argued that Superintendent Kelley or Executive Director Coad were not policymakers and, as the executive officials at the School District and ARIN, respectively, Plaintiffs contend that they were. See, e.g., McGreevy v. Stroup, 413 F.3d 359, 369 (3d Cir. 2005) (superintendent who gave teacher low rating was final policymaker because teacher was not required to appeal the decision to the school board, there is no exhaustion requirement under § 1983, and absent an appeal, the superintendent had final unreviewable authority to issue employment ratings, which he had delegated to the principal).

34

The "moving force" argument is inapplicable here.  As the Court of Appeals noted in the McGreevy case, there are three ways in which a municipality may be held liable for the torts of its employees, one of which is that "liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy."  413 F.3d at 367 (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986)).  "The Supreme Court's decision in Pembaur makes clear that an official with policymaking authority can create official policy, even by rendering a single decision."  Id. at 367-68.

In this case, top-level officials directed and complied with a request to transfer Nancy after she had raised issues of public concern.  The transfer was not a decision made by an employee uninvolved in the underlying events.  Nor was the transfer like the hiring decision in Bryan County, an act divorced from the later alleged constitutional violation.  Rather, the transfer is itself the act that forms the basis of her claim.  Therefore, the motions for summary judgment with respect to Count IV will be denied, except with respect to Plaintiffs' request for punitive damages.

Counts III, V - Intentional Infliction of Emotional Distress Claims

In Count III, Plaintiffs allege that Defendants Kelley and Ruddock subjected Rachel to the intentional infliction of emotional distress by failing to stop the alleged harassment by John Doe.  In Count V, Plaintiffs allege that Kelley subjected Nancy to the intentional infliction of emotional distress by transferring her to another position.  These Defendants move for summary judgment on the grounds that the alleged conduct does not rise to the level sufficient to maintain a cause of action for this tort.

The Court of Appeals has noted that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) (citation omitted).  See also Clark v. Township of Falls, 890 F.2d 611, 623 (3d Cir. 1989) ("[u]nder Pennsylvania law, courts have found intentional infliction of emotional distress only where the conduct at issue has been 'atrocious' and 'utterly intolerable in a civilized community.'") (quoting Restatement (Second) of Tort § 46, comment

35

d); <u>Hoy v. Angelone</u>, 720 A.2d 745, 754 (Pa. 1998) ("we believe that the factor of retaliation is an entirely appropriate consideration when determining the outrageousness of an employer's actions").  The court in <u>Cox</u> further noted that:

> the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee.  <u>See, e.g.,</u> <u>Bowersox v. P.H. Glatfelter Co.</u>, 677 F. Supp. 307, 311 (M.D. Pa.1988).  In <u>Bowersox</u> the plaintiff alleged that her employer not only sexually harassed her but withheld information from her which she needed to perform her job, forbade her from talking to anyone in her office, prohibited her from answering the phone, refused to talk to her and followed her throughout the plant.

<u>Id.</u> at 395-96 (footnote omitted).  In <u>Cox</u>, however, the court found that the act of firing an employee the first day he came back to work after being off for triple bypass surgery was not so outrageous as to sustain a claim for intentional infliction of emotional distress.

In Count V, Plaintiffs allege that Kelley's act of transferring Nancy in retaliation for her exercise of her First Amendment rights constitutes intentional infliction of emotional distress. These allegations do not rise to the level of outrageous behavior required to maintain a claim for this tort.  Therefore, with respect to Count V, the School District Defendants' motion for summary judgment will be granted.

In Count III, Plaintiffs allege that Kelley and Ruddock's actions constitute intentional infliction of emotional distress as to Rachel.  However, they have not cited any authority to support the argument that school administrators' failure to adequately address a student-on-student harassment situation rises to the level of conduct that would go so far "beyond all possible bounds of decency" that it would be "regarded as atrocious, and utterly intolerable in a civilized society."  <u>Kazatsky v. King David Memorial Park, Inc.</u>, 527 A.2d 988, 990-91 (Pa. 1987).  Therefore, with respect to Count III, the School District Defendants' motion for summary judgment will be granted.

## V.   CONCLUSION

Based on the foregoing, the motion for summary judgment filed by Defendant ARIN Intermediate Unit shall be granted with respect to Plaintiffs' request for punitive damages in

Count IV and denied in all other respects.  The motion for summary judgment filed by Defendants Indiana Area School District, Kathleen R. Kelley and Rodney Ruddock shall be granted with respect to Counts II, III and V of the complaint and denied with respect to Counts I and IV.  An appropriate order will follow.

Cercone, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RACHEL JONES** and **NANCY JONES**, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 2:03cv1081 |
| | ) | **Electronic Filing** |
| **INDIANA AREA SCHOOL DISTRICT,** | ) | |
| **KATHLEEN R. KELLEY, RODNEY** | ) | |
| **RUDDOCK** and **ARIN** | ) | |
| **INTERMEDIATE UNIT,** | ) | |
| Defendants. | ) | |

## ORDER OF COURT

AND NOW, this 25th day of October, 2005, upon consideration of the motions for summary judgment, the responses thereto, and the briefs and appendices filed therewith,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by Defendant ARIN Intermediate Unit (**Document No. 38**) is **GRANTED** with respect to Plaintiffs' request for punitive damages in Count IV and **DENIED** in all other respects.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendants Indiana Area School District, Kathleen R. Kelley and Rodney Ruddock (**Document No. 42**) is granted in part and denied in part. The motion is **GRANTED** with respect to Counts II, III and V. The motion is **DENIED** with respect to Counts I and IV.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:   Maureen Dunn Harvey
      Wallace, Chapas & Associates
      2220 Grant Building
      Pittsburgh, PA 15219

      John W. Smart
      Christina L. Lane
      1500 Ardmore Boulevard
      Suite 506
      Pittsburgh, PA 15221

      Douglas R. Nolin
      Frank G. Adams
      Peacock, Keller & Ecker
      70 East Beau Street
      Washington, PA 15301